# PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT

I, Evan Hendricks, provide the following Expert Report pursuant to Federal Rules of Civil Procedure 26(a)(2) in connection with the action entitled ***DP Professionals, Inc. v. Dun & Bradstreet, Inc.***: U.S. District Court for the District of South Carolina (Columbia Division); No.: C 3:10-cv-03112-CMC

### Introduction

Defendant Dun & Bradstreet ("Defendant") is in the business of credit reporting. The main difference between this case and the estimated 100 cases in which I have been retained as an expert, is that rather than consumer credit reporting, as governed by the Fair Credit Reporting Act ("FCRA"), this case involves credit reporting on a small business.

Apart from that key difference, there are substantial similarities between this case and my consumer/FCRA cases.

In my consumer/FCRA cases, I am often retained because a consumer credit reporting agency causes inaccuracies that damage the Plaintiff by portraying him/her falsely or in a misleading way, interfering with Plaintiff's economic and non-economic well-being, and/or otherwise violating his/her privacy.

The main causes of inaccuracies that damage plaintiffs in these cases are:

- Mixed files caused by unreasonably over-inclusive methods of "partial matching" of the plaintiff's identifiers; and/or

- Unreasonable investigations of the disputed inaccuracies by the credit reporting agency ("CRA"); and/or

- Reinsertion of previously deleted, inaccurate data into the plaintiff's credit file. According to the long-standing definition in the field of credit reporting, "reinsertion" means that Defendant communicated to third parties information about Plaintiff that it knew was false or had serious reservations about its truth.

In this case, because of Defendant's grossly inadequate and unreasonable practices, procedures, and policies it has achieved a "trifecta," having wrongly mixing certain "trade experiences" that were not theirs into Plaintiff DP Professionals' ("Plaintiff") files, and then compounded the damage through both unreasonable investigations of disputed inaccuracies and finally, reinsertion.

None of this was by accident. Defendant intentionally has created a system that seeks to include any possible negative information that it can find on businesses so it can then force businesses to contact Defendant about the negative information Defendant sold, and then sell to those businesses a "monitoring" service that will "protect" them from more negative information

1

in the future.  Put simply, Defendant leverages the negative information it collects and sells into its own kind of "protection racket."  Plaintiff's case shows that Defendant does this with reckless disregard for the accuracy or fairness of the negative, reputation-damaging information it sells.

By disseminating negative, false data about Plaintiff, Defendant damaged its reputation and caused it economic harm.

### Overly Inclusive, 'Loose' Approach to Matching

Defendant uses loose "partial matching" algorithms in order to decide what information is routed electronically to the "file" of which business.  While the algorithms are proprietary, they are based on a business-name-and-address match. (Dietrich, 81** -- ** Note: all page numbers reflect a cut-and-paste of Depos from a text file and converting them to a MS Word file.)

Under Defendant's approach, the business name does not have to be the same; it only need be "similar." Then, according to Defendant, Defendant assigns a "confidence code," with "A" being a "dead-on match, byte-for-byte," and other letters reflecting a partial match. "One is the lowest confidence, ten is the highest confidence.  And the last I knew they took any confidence codes seven or above." [Dietrich, 127-28]

Defendant's system is designed to be overly inclusive so it collects the maximum possible information that might possibly relate to any given business.

Defendant system is so over-inclusive that it came up with some bizarre matches that unjustly associated negative information with Plaintiff.  For instance, "Courtney Johnson," of "308 Percival Road, Apartment 501, Columbia, SC, 29206," associated Plaintiff with a derogatory "slow pay" notation [Althouse Depo., 72 & DNB 170].

Similarly derogatory information provided by BellSouth, Nextel, Staples and Securitas Security Systems was wrongly associated with Plaintiff.

Defendant attributed these inaccuracies to "mismatches," meaning that the identifiers of others, like Courtney Johnson, were somehow causing the wrongful associations, or to a "system error," which Defendant could neither identify nor explain. [Dietrich, 169]  In my opinion, it was reckless for Defendant to wrongfully associate such negative data with Plaintiff and then sell it. Defendant's recklessness and disregard for fairness and accuracy is underscored that it is either unable or unwilling – or both – to determine how and why it is causing these problems.

Defendant's disregard for fairness and accuracy is also underscored by the fact that "to this day, Dun & Bradstreet's position is that the only thing that was incorrect in DP Professionals' report was that lone Nextel trade experience" [Dietrich, 120]; and, that the "Nextel match was appropriate/correct according to DNB Guidelines [Dietrich, 65-67]; and, that even Courtney Johnson was a correct match [Dietrich, 67]; and, that there were no other mismatches [Dietrich, 70].

**Defendant's Callous Response To Plaintiff's Disputes Reflect Disregard for Fairness/Accuracy**

When a business like Plaintiff disputes inaccuracies, Defendant in most cases handles them through its "auto-delete" process. Under this process, unless the supplier of the inaccuracy proactively confirms it should stay, the inaccuracy is auto-deleted. There is no human review or involvement.

However, Defendant does no type of inquiry or investigation to determine what is causing the inaccuracy (like Defendant's overly inclusive approach to partial matching) or whether the supplier of the information is unreliable or even abusing its status as a data supplier.

Under Defendant's auto-delete process, if a supplier supplies inaccurate, damaging data 12 months in a row, it goes back on every month. [Dietrich, 147] In Plaintiff's case, inaccurate, damaging data was auto-deleted four times without any investigation by Defendant. The false information was systematically and intentionally re-routed to Plaintiff's DNB file each time. [Dietrich, 165] In total, there were 12 auto-deletes from four companies. [DNB 211]

DP Professionals began complaining or disputing in January of 2009 it took 20 months or so for their disputes to be escalated. [Dietrich, 102] Again, this reflected Defendant's utter disregard for accuracy and fairness, as well as the damage it inflicted upon the victims of its inaccuracies like Plaintiff.

Of course, the auto-delete process is Defendant's principal process because it is much more "cost effective" than conducting the types of investigations that are necessary to ensure fairness and accuracy. [Dietrich, 182-83]

**Reinsertion**

In the field of credit reporting, it has long been recognized that reinsertion of previously deleted information is particularly egregious and damaging. For starters, the credit reporting agency already knows the information does not belong in the data subject's file. The three major CRAs all have systems in place to detect and prevent reinsertion.

Second, it is particularly damaging because the data subject already has expended some time and effort to dispute and remove the inaccuracy. Moreover, the data subject has the reasonable expectation that the problem has been taken care of and will not reoccur.

Nonetheless, as Plaintiff's case vividly illustrates, Defendant systematically permitted reinsertion of derogatory inaccurate information with reckless abandon. [DNB 211 & Dietrich, 116, 120, 147, 165]

According to the long-standing definition in the field of credit reporting, "reinsertion" means that Defendant communicated to third parties information about Plaintiff that it knew was false or had serious reservations about its truth. Under its auto-delete policy and practice, Defendant not only knew that it had removed false data, but also knew that suppliers would

3

continue providing the same false data regarding Plaintiff, and Defendant also knew that it would continue reinserting the false information into Plaintiff's file.

Thus, Defendant's auto-delete process results in an "auto-reinsertion" process. One egregious result of this is that it imposes on the victim of the inaccuracy to expend the time, energy and resources to constantly re-dispute inaccuracies that never should have be put in the file in the first place. This compounds the damage to victims such as Plaintiff. Moreover, it damages victims such as Plaintiff by unnecessarily creating and/or adding to friction within the victimized organization.

### Defendant's Unfair Use of Data Helps Classify Its Trade Practice

None of this is by accident. Defendant intentionally has created a system that seeks to include any possible negative information that it can find on businesses so it can then force businesses to contact Defendant about the negative information that Defendant sold to others, and then sell to those businesses that are the subject of negative reports a "monitoring" service that will "protect" them from more negative information in the future. Put simply, Defendant leverages the negative information it collects and sells into its own kind of "protection racket." As the above discussion illustrates, Plaintiff's case shows that Defendant does this with reckless disregard for the accuracy or fairness of the negative, reputation-damaging information it sells.

Defendant's scheme is a clever one. In Plaintiff's case, it began with a marketing-styled letter stating that someone was "making inquiries" about Plaintiff, and that Plaintiff should contact Defendant to learn more. Then, when a company like Plaintiff's calls Defendant, either before or after it is victimized by inaccurate, derogatory data, it is first routed to a salesperson. Unlike the three major CRAs, there is no separate 800 number for disputes only. The salespeople "are going to listen to your question or your issue. And do some probing. And if there's a solution, meaning a product or a service that could satisfy that question or issue that you have, they are going to present that. If there's not, or if you decline to purchase, the call is then forwarded on to our customer service agents." [Dietrich 91-94]

Thus, if the victimized business had not purchased Defendant's monitoring product, they effectively wouldn't know that inaccurate derogatory data had been reinserted. This assuredly makes for a persuasive sales pitch to the victimized business that Defendant seeks to exploit for additional revenues. Put simply, Defendant creates a problem for the victimized business by wrongly associating them with inaccurate derogatory data, and then sells them the "solution" to that problem in the form of a $499 - $799 monitoring service. As one might observe sarcastically, "That's good work if you can get it."

But its grossly unfair, in my opinion.

### Businesses Regularly Complain About Defendant's Inaccuracies, Trade Practices

The Internet is filled with complaints from small businesses about Defendant. The complaints mainly concern inaccuracies and Defendant's efforts to convince business to pay for Defendant's monitoring services in order to correct errors.

For instance, at the "Ripoff Report" Web site, one can find a long list of complaints:
http://www.ripoffreport.com/directory/Dun-Bradstreet.aspx

This Web site has several complaints on one page:

http://dun-bradstreet.pissedconsumer.com/dun-bradstreet-d-b-d-b-dnb-20080129111984.html

This Web site also has several complaints on one page:

www.complaintsboard.com/complaints/dun-and-bradstreet-california-c281598.html

### Potential Areas of Testimony: Damages Known & Common To Victims of Chronic Credit Report Inaccuracy

It is important that the trier of fact understands that victims of chronic credit report inaccuracy often experiences a series of several known and common types of negative impacts. I developed the below methodology to help people understand the many ways in which chronic credit report inaccuracy are damaging. Of course, this was developed with consumer cases in mind.

Below, I will explain which categories apply to a case like Plaintiff's, involving a small business.

### Some Categories of Typical Negative Impacts of Chronic Inaccuracy

(1) Inaccurately described as not creditworthy and/or less creditworthy to third parties; damage to reputation;
(2) Improperly denied credit or insurance because of inaccurate data, or only able to obtain credit or insurance at less favorable rates;
(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity
(4) Wrongfully received debt collection calls
(5) Chilled from applying for credit
(6) Sleeplessness, physical symptoms
(7) Sense of helplessness, loss of control over personal data
(8) The emotional distress stemming from, and associated, with all of the above

### Categories Applicable To Plaintiff

(1) Applies
(2) Discovery will determine the extent to which this applies. A related issue that belongs in this category, of which Discovery will determine the extent, is loss of business or loss of potential business caused by Defendant's actions.

(3) Applies; amplified by Defendant's concealment of the sources of "Trade Experiences," and by "rounding" the amount of the "Trade Experiences"
(4) Does not apply, but did receive annoying "sales" calls from Defendant
(5) Discovery will determine the extent to which this applies
(6) Does not apply
(7) Loss of Control applies, because Plaintiff's competitor had obtained a report, and Plaintiff had no way of knowing precisely what was in that report, or how the competitor, or others for that matter, further communicated negative information about Plaintiff. Similarly, Plaintiff could not readily determine what companies were providing what inaccurate data about it.
(8) While emotional distress does not apply, Defendant's actions did cause intra-company friction for Plaintiff that was significantly damaging.

The following factors could be used to gauge the severity of damage within each category.

### Key Factors To Consider When Assessing Severity of Negative Impact

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

### Conclusion

Plaintiff built its business from scratch and worked over 10 years to build an excellent reputation in its industry. Defendant damaged Plaintiff's reputation by repeatedly publishing false derogatory information about Plaintiff. These publications were made to Plaintiff's prospective customers and partners, as well as its major competitor in the market – in other words the entities with whom Plaintiff was most concerned with maintaining and protecting its reputation. The full extent of these damages may be unknown even to Plaintiff, and "ripple" for years after the initial injury.

The derogatory information included not only false and wrongly attributed trade experiences (such as "slow pay," "bad debt," "past due," etc.) but also highly wrongful characterizations of Plaintiff's creditworthiness and viability. These characterizations include, for example, the representation by Defendant that Plaintiff's "probability of severely delinquent payment is higher than average among businesses in D&B's Database."

Also egregious was Defendant's reinsertion into Plaintiff's file of previously deleted inaccuracies. In the field of credit reporting, "reinsertion" means that Defendant communicated to third parties information about Plaintiff that it knew was false or had serious reservations about its truth. Under its auto-delete policy and practice, Defendant not only knew that it had removed false and disputed data, but also knew that suppliers would continue providing the very same false data regarding Plaintiff, and Defendant also knew that it would continue reinserting the false information into Plaintiff's file. In my opinion, Defendant acted in reckless disregard

6

of its duty to make a fair and accurate report, and in complete disregard to its representations that the reports it sold were accurate.

## Background & Qualifications (Curriculum Vitae Attached)

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covers credit reporting, Fair Information practices and related matters;

(2) Author of the book Credit Scores and Credit Reports: How The System Really Works, What You Can Do, 3rd Edition, (Privacy Times 2005), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation:

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, Credit Scores and Credit Reports: How The System Really Works, What You Can Do (3rd Edition, Privacy Times 2007. The book has 23 Chapters, 399 pages and 415 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights. I also am co-author of Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts. As an expert witness, I have had the opportunity to

7

read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data. In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets. To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation. Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified numerous times before Congress – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information. (Consult CV for list of hearings and Web links to testimony.)

In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[1]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[2]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[3]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[4]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

---

[1] http://banking.senate.gov/03_07hrg/071003/index.htm
[2] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[3] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[4] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

I regularly present at Continuing Legal Education or professional seminars related to the FCRA. (Consult CV.)

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices." First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

**Testimony & Expert Reports**

Within recent years, I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies. Expert report, deposition, trial testimony. Judge Lourdes Baird presiding. The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures. (see 225 F.3d 1063 (2000)).

Eric Robert Drew vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California , Case No. CV 07-00726-SI. Trial testimony. Expert report, deposition. Judge Susan Illston presiding.

Angela P. Williams vs. Equifax Information Services, LLC, et al., Circuit Court for the Ninth Judicial Circuit, Orange County Florida. Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony. Judge George A. Sprinkel IV presiding.

Direct Data Solutions, Inc., v. Bailey & Associates Advertising, Inc.: Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida; Case No.: 07-9322 CA 09. Judge Jerald Bagley presiding.

James Parker Byrd v. TransUnion LLC, Experian Information Solutions, Inc., Equifax Credit Information Services, LLC: U.S. District Court for the District of South Carolina Case No.: 3:09-cv-00609-JFA [Columbia Div.]. FCRA, mixed file. Expert report, deposition.

Brenda F. Campbell v. Experian: U.S. District Court for the Western District of Missouri (No. 07-2514). FCRA. Expert report, deposition. Trial Testimony. Judge Nanette K. Laughrey presiding.

Harold & Beryllin Gamby v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Michigan [Southern Div.] (CV-06-11020-MO). FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Marianne O. Battani presiding.

Deborah Adams v. National Engineering Service Corp./Verifications Inc.,: U.S. District Court for the District of Connecticut. 3:07-cv-01035-JCH. FCRA. Expert report, deposition. Trial Testimony. Judge Warren W. Eginton presiding.

Patricia Holmes vs. TeleCheck Intl., Inc., U.S. District Court for the Middle District of Tennessee (Nashville Div.). FCRA. Expert report. Deposition. Trial Testimony. Chief District Judge Todd J. Campbell presiding.

Rebecca L. Valentine. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO. FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Robert E. Jones presiding.

<u>Nicole Robinson vs. Equifax Information Services, LLC, et al.</u>, U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.  Expert reports.  Deposition. Trial Testimony   Judge Walter H. Rice presiding.

<u>Suzanne Sloane vs. Equifax Information Services, LLC, et al.</u>, U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.  Expert reports.  Deposition.  Trial Testimony   Judge Leonie M. Brinkema presiding.

<u>Matthew Kirkpatrick v. Equifax, LLC</u>,  U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO.  FCRA  Expert report. Trial Testimony. Judge Michael W. Mosman presiding.

<u>Sandra Cortez vs. Trans Union, LLC.</u>, U.S. District Court for the Eastern District of Pennsylvania: No. 2:05 –cv—05684-JF.   FCRA.   Expert Report. <u>Daubert</u> Hearing. Trial Testimony.  Senior Judge John P. Fullam qualified me to testify at trial.

<u>Federal Trade Commission vs. Accusearch, Inc., et al.</u>, U.S. District Court for the District of Wyoming, Case No. 06CV0105-D.  FTC Section 5.  Expert Report.  U.S. Magistrate Judge William C. Beaman rejected Defendants' motion to exclude my testimony.

<u>Eddie Silva, et al. v. Haynes Furniture Co., Inc.</u>: U.S. District Court for the Eastern District of Virginia:  No. 4:04CV82. FCRA.  Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

<u>Joi Helmes v. Wachovia Bank N.A.</u>:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

<u>Alex Campos and Michael York v. ChoicePoint Services, Inc.</u>: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD.  FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

<u>Denis W. Stasulis v. Suntrust</u>:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

<u>Dwaine Perry, et al. v. FleetBoston Financial Corp.</u>: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report.  Fairness hearing testimony.  Judge Berle M. Schiller presiding.

<u>Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al</u>: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony Judge Florence-Marie Cooper presiding.

<u>Myra Coleman v. Trans Union LLC</u>, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA.  Expert report, deposition, trial testimony.  Judge Neal B. Biggers presiding.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE. FCRA. Expert report, deposition, trial testimony. Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition. Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr. v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition. On the eve of trial, Judge Richard Williams rejected Defendants' motion to disqualify me. The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony. Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22. Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

Alana Valerie Sheldon v. Trans Union, LLC., LVNV Funding, LLC, & Resurgent Capital Services L.P.: U.S. District Court for the District of Maryland; 8:08-cv-00057-PJM. Expert report, deposition.

In Re: Cellphone Termination Fee Cases, Superior Court of the State of California, Alameda County, JCCP No. 4332. Deposition.

Karl Benedikt v. ChoicePoint, Inc.,: U.S. District Court for the District of New Jersey [Newark Vicinage]; 07-2569. Expert report, deposition.

Abdirizak Gayre v. CSC Credit Services, Inc., Equifax Information Services, LLC, and Afni, Inc.: U.S. District Court for the District of Minnesota (C.A. No. 07-CV-0622 [JRT/FLN]). FCRA. Expert report, deposition.

Erin Ayles v. Experian Information Solutions, Inc.: U.S. District Court for the Eastern District of Virginia (Alexandria Division); 1:07cv 662. Expert report, deposition.

Maria D. v. Comcast Corp., Sacramento Superior Court, Case No. 03AS05745. Deposition.

In Re: Farmers Insurance Co., Inc., FCRA Litigation, U.S. District Court for the Western District of Oklahoma, Case No. CIV 03-158-F.  FCRA. Expert report, deposition.

Steven E. Beck v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347. FCRA.  Expert report, deposition.

Ford Motor Credit Co. v. Sudesh Agrawal, Court of Common Pleas, Cuyahoga Country, Ohio; Case No. CV04536588.  Credit reporting and credit scoring. Deposition.

Larry Alabran v. Capital One Services, Inc.,: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

Gail Cope v. MBNA American Bank NA: U.S. District Court for the District of Oregon; No. 04-CV-493-JE.  Expert report, deposition.

Robert Gordon Peoples v. Experian Services Corp., et al.: U.S. District Court for the Central District of California: No. CV-04-1378 CAS (Ex). Expert report. Deposition.

Lottie Robertson v. Experian Information Services, Inc. & Capital One Bank: U.S. District Court for the Eastern District of Michigan (Southern Div.) No. 04-72308. Expert report. Deposition.

Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE.   FCRA. Expert reports. Deposition

Bruce Danielson v. Experian Information Solutions:  U.S. District Court for the Northern District of Texas, Case No: 3-04CV-1722N. FCRA. Expert report. Deposition.

Stacy Lawton Guin, et al. v. Brazos Higher Education Service Corporation, Inc.: USDC-Minnesota – No. CV 05-668 RHK/JSM. Negligence. Security Breach. Affidavit. Deposition.

Anthony Chin v. State Dept. Federal Credit Union: Circ. Ct. Prince George's County (Maryland); Civ. Act. No. CAL04-12778; Tort. Deposition.  Trial testimony.

James M. McKeown v. Sears Roebuck & Co., et al: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C.  Expert Report, deposition.

Paulette Field v. Trans Union LLC, et al., Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div.  FCRA. Expert report.  Deposition.

Earle E. Ausherman, et al. v. Bank of America Corporation et al.: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438.  FCRA. Expert report.  Deposition.

Jesse Klco v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433.  FCRA.  Expert report, deposition.

13

(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis.: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.

Bruce Butcher and Pam Butcher v. Chase Manhattan Bank, U.S.A., Inc., U.S. District Court for District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.

## FEE

My fee is $300 per hour for preparation of expert report, consulting, or trial testimony; $400 per hour, or a minimum of $1,200 per day, for deposition testimony, plus reasonable travel time, plus travel costs and expenses.

*Evan D. Hendricks*
*CURRICULUM VITAE*

**Professional Activities**

1981- Present          **Editor/Publisher** of *Privacy Times*

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA).  The newsletter ranges from 8-12 pages, 23 issues per year.  Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

**1992 – Present        Expert Witness**

Qualified by the federal courts in FCRA and identity theft cases.  (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

**1998 – Present        Privacy Expert Consultant, U.S. Social Security Administration**

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

**2002 – 2004    Member, Experian Consumer Advisory Council**

Along with other Council members, I provide an outsider's view on credit reporting, marketing and other privacy issues.

**July – October 2002      Consultant to U.S. Postal Service**

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

**Evan Hendricks        P.O. Box 302        Cabin John, MD 20818
         (301) 229 7002  (301) 229 8011 [fax]   evan@privacytimes.com**

**Recent Testimony Before Congress & The FTC**

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.[5]

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006[6]

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit, November 9, 2005[7]

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005[8]

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information,"[9] Senate Banking Committee, March 15, 2005
"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[10]
"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[11]
"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[12]
"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[13]
"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do [3rd Edition] (Privacy Times, 2007)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

---

[5] www.house.gov/apps/list/hearing/financialsvcs_dem/ht061907.shtml

[6] http://energycommerce.house.gov/108/Hearings/06202006hearing1938/Hendricks.pdf
[7] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=425
[8] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=407
[9] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144
[10] http://banking.senate.gov/03_07hrg/071003/index.htm
[11] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[12] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790

[13] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

Former Secrets: Government Records Made Public Through The Freedom of Information Act (Campaign For Political Rights, 1982)
**International Lectures**
24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales – Presentation published in conference proceedings, 2002)
The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne – Presentation published in conference proceedings, 2001)
The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)
The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).
In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and Privacy Commissioner of Australia.

**Presentations/Instruction At Recent CLE & Professional Seminars**
"Second Law and Information Society Symposium: Enforcement, Compliance and Remedies in the Information Society," Presenter, "Credit Report Cases – Effective Remedies?" Center on Law and Information Policy (CLIP), Fordham Law School, New York, May 29-30, 2008.)[14]
"The 1st Annual Privacy Law Scholars Conference," Presenter, "Assessing Privacy Harm: How can victims of privacy violations prove that they have been harmed? The George Washington University Law School, Washington, DC, June 12-13, 2008.[15]
"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21, 2006 (New York City)
"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer Law Center, October 27, 2005
"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005
"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute,
February 28- March 1, 2005 (New York City)
"The New FACT Act: Challenge & Oppty.," Privacy & American Business, Feb. 9-10, 2004
"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process," Glasser LegalWorks, Sept. 28-29. 2004
"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004
**Professional Societies**
Past President & Board Member, American Society of Access Professionals www.accesspro.org
**Industry Certification**
FCRA Certification, National Credit Reporting Association (www.ncrainc.org).
Media
In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996, I am quoted regularly by major and small newspapers (including The Washington Post, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek and Money Magazine), regarding issues of privacy generally and the privacy implications of consumer reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News, CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey Show and Geraldo, regarding these issues as well.

---

[14] http://law.fordham.edu/ihtml/eventitemPP.ihtml?id=37&idc=8943&template=clip
[15] http://privacyscholars.com

**Education**
Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)

**MATERIALS CONSIDERED**

In specific preparation for this case, I have reviewed the following:

Plaintiff's Complaint
Plaintiff's credit reports
Bates-stamped documents produced by Defendants & Plaintiff
Defendants' and Plaintiff's Answers and Responses to Interrogatories

I also generally rely upon:

The Fair Credit Reporting Act & Consumer Credit Reporting Reform Act of 1996
<u>Fair Credit Reporting Act (w/ Companion Disk & 2000 Cumulative Supplement</u>, National Consumer Law Center, 1998 (Boston)
<u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (3rd Edition, Privacy Times 2007),

     My opinions in this case are also based on my 31-year profession of following privacy developments including those relating to the consumer reporting and information broker industry and the criminal justice system as a journalist, editor, publisher and privacy expert.  My experience includes listening to and participating in dozens of hours of Congressional testimony, hearings before the Federal Trade Commission, media coverage, studies by independent groups, my own personal observations and numerous contacts, and my previous work preparing to be an expert witness in other FCRA cases.

     **Executed This The 2nd Day of January 2012 in Bethesda, Maryland**

**/s/  Evan D. Hendricks**
**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002